William J. COCHRAN, Jr., Plaintiff,

v.

Kenneth COLLINS, individually and as Fire Chief of the City of Union City, Ga.; Robert Fronebarger, individually and as Public Safety Director of the City of Union City, Ga.; Sonya Carter, individually and as City Administrator of the City of Union City, Ga.; and the City of Union City, GA, Defendants.

No. CIV.A. 101CV1266–CAP.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 6, 2003.

Susan Lee Rutherford, William Emery Gray, II, Evan Richard Mermelstein, Gray Hedrick & Edenfield, Atlanta, GA, for plaintiff.

John Lewis Sapp, Sharon P. Morgan, James J. DuBois, Elarbee Thompson Sapp & Wilson, Atlanta, GA, for defendants.

### ORDER

PANNELL, District Judge.

This matter is now before the court on various motions filed by both parties. For the reasons set forth below, the defendants' motion for summary judgment [Doc. No. 29–1] is GRANTED as to the federal claim, and the plaintiff's motion to strike declarations [Doc. No. 44–1] is DENIED as moot. The court declines to exercise supplemental jurisdiction over the remaining state law claims. Those claims are dismissed without prejudice.

Additionally, the plaintiff's motion to extent time to respond to the summary judgment motion [Doc. No. 32–1] is GRANTED nunc pro tunc, and the plain-tiff's motion to file excess pages [Doc. No. 46–1] is GRANTED nunc pro tunc.

### I. Factual summary

In analyzing a summary judgment motion, the court resolves all issues of fact in favor of the non-movant. *Cottrell v. Caldwell,* 85 F.3d 1480, 1486 (11th Cir.1996). Accordingly, the court states the facts of the case in the light most favorable to the plaintiff. Therefore, the facts as stated below may not prove to be the facts that would be established at trial. *See Hartsfield v. Lemacks,* 50 F.3d 950, 951 (11th Cir.1995).

The plaintiff filed this action on May 17, 2001, pursuant to 42 U.S.C. § 1983 and state law, following his termination from the Union City Department of Public Safety's Fire Bureau ("the Fire Bureau"). The named defendants are Kenneth Collins (Fire Chief of Union City), Bobby Fronebarger (Public Safety Director for Union City), Sonya Carter (City Administrator for Union City), and Union City, Georgia. The individual defendants are named in both their individual and their official capacities. The plaintiff alleges that the defendants (1) violated his procedural due process rights under the Fourteenth Amendment to the U.S. Constitution, (2) violated his substantive due process rights under the Georgia Constitution, and (3) breached his employment contract with Union City under Georgia law.

The plaintiff was employed by the Fire Bureau as a firefighter and paramedic from August 25, 1999 until October 16, 2000. The incident that led to his termination was his urination in the safety boots of a co-worker, Chris McElroy, on September 7, 2000. Mr. McElroy discovered the urine in his boots during his shift the following morning and complained about the incident.

The boots at issue were part of protective equipment supplied by the city to reduce the hazards firefighters and paramedics face on the job, including the risk of catching diseases. This protective gear also includes a jacket, pants, a helmet, gloves, and a breathing apparatus. Firefighters and paramedics are instructed to keep their gear in good condition at all times.

During the plaintiff's employment at the Fire Bureau, members routinely played pranks on each other. Among these pranks were freezing a firefighter's uniform, sunglasses and/or underwear, "passing gas" into one's hand and putting it in a firefighter's face, tampering with a firefighter's automobile, placing a dead opossum in a firefighter's locker, placing a female firefighter's underwear on the side of her locker, faking that one is going to cut or stab a firefighter with a knife, and setting off fireworks at the station house. Such pranks were committed both before and after Kenneth Collins became Fire Chief. Other, more serious pranks occurred at the Fire Bureau prior to that time, and no written or enforced policies specifically prohibited such behavior.

## A. The Fire Bureau's initial response to the incident

On September 9, the day after Mr. McElroy discovered the urine in his boots, Lt. Frank West called and informed Fire Chief Collins about the incident. Chief Collins was away on vacation, but instructed Lt. West to question employees about the incident.

The plaintiff eventually confessed that he was the one who had urinated in Mr. McElroy's boots. Lt. Alexander then placed the plaintiff on administrative leave with pay and prepared a statement to Chief Collins regarding the damage to Mr. McElroy's boots, his investigation, and the plaintiff's admission.

Sgt. Dillard, who is one of the plaintiff's supervisors, denied any involvement in the incident and prepared a statement to that effect. Jeff Collins, another firefighter, had informed Lt. West that he observed suspicious behavior by the plaintiff and Sgt. Dillard near the place where Mr. McElroy's boots were stored and thought they might be responsible for the incident. However, the plaintiff argues that Mr. Collins is an unreliable witness.

## B. Fire Chief Collins' investigation and recommendation

When Chief Collins returned from his vacation he spoke with Lt. Alexander and reviewed the statements written by Lt. Alexander and Sgt. Dillard. On September 11, he interviewed several individuals regarding the incident. Mr. McElroy and Mr. Collins both informed him that they wanted to be transferred to another station, although the reasons for their requests—and, more specifically, their relation to the incident—are disputed. Mr. McElroy also told Chief Collins that he was angry and afraid of catching a disease from his exposure to the urine.

Chief Collins also met with the plaintiff and allowed him an opportunity to tell his side of the story. The plaintiff admitted his involvement, stated that Sgt. Dillard had not been involved, and said he was sorry for what he had done. He also told Chief Collins that he had acted in response to someone, who he believed to be Mr. McElroy, placing a liquid substance (possibly urine) in one of his boots a few days earlier.

Section 96.52.03 of the city handbook gave Chief Collins the authority to make a recommendation to Bobby Fronebarger, who was his supervisor and the city's Public Safety Director, regarding what action to take against the plaintiff for his act. Thus, Chief Collins drafted a memoran-

dum to Director Fronebarger, recommending the plaintiff's resignation for engaging in conduct that the handbook listed as unacceptable and grounds for discharge. The relevant handbook section, § 96.44, provides:

> To ensure orderly operations and provide the best possible work environment, Union City expects employees to follow rules of conduct that will protect the interests and safety of all employees and the City.... The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment: ... Boisterous or disruptive activity in the workplace; Negligence or improper conduct leading to damage of employer-owned ... property; ... Violation of safety or health rules....

Chief Collins maintains that he felt a lesser punishment would not suffice because (1) the incident had disrupted morale at the Fire Bureau and caused the transfers of Mr. Collins and Mr. McElroy and had led other employees to no longer trust the plaintiff or want to work with him, (2) the plaintiff had violated safety and health rules and deliberately exposed a fellow firefighter to increased safety risks, and (3) he had never received a complaint of someone tampering with another firefighter's equipment or exposing a co-worker to bodily fluids and risk of disease.

However, the plaintiff disputes this rationale and the facts underlying it. Specifically, he argues that morale at the Fire Bureau had already been disrupted by other, more substantive matters, i.e., Lt. West's alleged sexual harassment of a female firefighter and resentment by firefighters of the way the city was being run, and that Mr. Collins' reason for requesting a transfer was actually because he had just "ratted on" the plaintiff and Sgt. Dillard. He also states that a September 12 letter from a medical doctor to the Fire Bureau advised that it is unlikely that someone could contract communicable diseases by stepping in urine. Additionally, he notes that no one could remember any earlier incidents of a complaint arising from a prank and that Chief Collins had only been chief for fourteen months at the time and had not been involved with an incident like this before. Finally, he points out that Chief Collins' memorandum did not mention the particular matters which later became significant, i.e., that the prank was to Mr. McElroy's protective equipment or that the chief feared a confrontation between the plaintiff and Mr. McElroy, and did not consider the plaintiff's allegation that he was responding to a prank committed against him.

## C. Public Safety Director Fronebarger's investigation and recommendation

Upon receiving Chief Collins' recommendation, Director Fronebarger arranged a September 13 meeting with the plaintiff to hear his side of the story. Director Fronebarger told the plaintiff why he had been called for the meeting and then asked about the incident. The plaintiff admitted that he had urinated in Mr. McElroy's boots, explained that it was in response to a prank committed against him, stated that it had been poor judgment, and apologized for it.

After meeting with the plaintiff, Director Fronebarger interviewed several employees regarding the incident, including Lt. West, Mr. McElroy, and Chief Collins. Lt. West informed him that he did not want to work with anyone who would take such an action. Mr. McElroy said he was extremely angry about the incident and the fact that he was exposed to urine, and he said he did not wish to work with the plaintiff. Director Fronebarger asked Mr. McElroy whether he had urinated in the plaintiff's boots (as the

plaintiff alleged), and he said that he had not.

Director Fronebarger also instituted an internal investigation to determine whether Sgt. Dillard was involved in the incident. The investigation did not uncover any proof that Sgt. Dillard was involved. To the extent that it was designed to uncover the truth about the incident, the plaintiff complains that some individuals were not interviewed, including one person who would have testified favorably for the plaintiff. The plaintiff also complains that the investigation was initiated immediately after Director Fronebarger made a decision regarding the plaintiff. Finally, the plaintiff says that the investigation was later used to threaten him to implicate Sgt. Dillard.

On September 19, Director Fronebarger prepared a letter to the plaintiff, stating that he was recommending discharge to Sonya Carter, the City Administrator. The following day, Chief Collins gave the plaintiff a copy of the letter, explained it to him, and allowed him to ask questions. The letter advised the plaintiff that the recommendation was based on violation of safety and health rules, disruption of the workplace, and destruction of city property caused by his urination in Mr. McElroy's boots. The letter also referred the plaintiff to the handbook for information regarding his appeal rights.

The plaintiff has indicated that he did not receive the letter until after he was interviewed by Detective Orlando Battle. At that interview, the plaintiff was instructed that if he refused to "tell the truth" about Sgt. Dillard's involvement the incident would be reported to the state licensing board and the plaintiff's credentials would be suspended or revoked, but that if he did implicate Sgt. Dillard he would be allowed to keep his job.

## D. City Administrator Carter's initial decision and subsequent review of that decision

On September 22, Director Fronebarger forwarded a package of materials on the matter to City Administrator Carter for her decision. Section 96.52.03 of the handbook gave her the authority to accept or reject Director Fronebarger's recommendation of discharge.

That same day, the plaintiff prepared a letter of appeal to City Administrator Carter challenging the recommendation. The plaintiff argued that the punishment was too harsh, that lesser discipline would suffice, and that he had been treated unfairly because pranks were a routine part of fire department life. Upon receipt of the letter, City Administrator Carter advised the plaintiff that his appeal was premature because she had not yet made her initial decision.

City Administrator Carter then spoke with Director Fronebarger and Chief Collins regarding the incident, the plaintiff's admission of guilt, the disruption it had caused in the workplace, and Mr. McElroy's health concerns. She also reviewed the recommendations, the plaintiff's personnel file, and the results of the internal affairs investigation into Sgt. Dillard's possible involvement.

On September 27, City Administrator Carter sent the plaintiff a letter informing him that she concurred with Director Fronebarger's recommendation that he be discharged for inappropriate removal of city property, improper conduct leading to damage to employer-owned property, engaging in disrespectful conduct, engaging in disruptive activity in the workplace, and violating safety and health rules. Each of these is listed as a dischargeable offense in § 96.44 of the handbook. The letter also advised the plaintiff that he had three

working days to respond, or he would waive his appeal rights.

On October 9, the plaintiff met with City Administrator Carter to respond to the letter and tell his side of the story. During the meeting, he admitted that he had urinated in the boots and expressed remorse. He also elaborated on the allegations in his appeal letter and told her that pranks were routinely played at the Fire Bureau and that his discharge was unfair. At the end of the meeting, City Administrator Carter told him she would investigate and would respond to his appeal.

City Administrator Carter indicates that in considering the plaintiff's response, she reviewed his appeal letter and investigated his allegations, but found nothing to support his claims. The plaintiff disputes this fact, claiming that pranks were routine and that the atmosphere at the Fire Bureau was such that he would not know that he would be terminated for urinating in someone's boots.

The plaintiff also disputes City Administrator Carter's stated reasons for believing she had the power to skip progressive discipline and proceed to immediate discharge. Section 96.52.02(B)(4) of the handbook provides, "An employee may be dismissed for disciplinary reasons when all other alternatives have failed to solve the problem or when it is necessary to remove the employee from the workplace immediately and/or permanently." City Administrator Carter states that she believed that a lesser punishment would not adequately respond to the situation and that the plaintiff had to be immediately removed from the workplace because he had acted maliciously in exposing a co-worker to harm. However, the plaintiff argues that her beliefs were based on false and misleading information and that she misunderstood the purpose of progressive discipline.

On October 10, City Administrator Carter sent the plaintiff her final notice of adverse action pursuant to § 96.52.04 of the handbook. This letter advised the plaintiff that, after considering his comments, she was discharging him for the reasons stated in her earlier letter. It also informed the plaintiff of his appeal rights and cited the relevant handbook provisions.

## E. The appeal process

The plaintiff read the handbook provisions regarding the appeal procedure and cited them in his first appeal letter. He also understood that it was his duty to comply with those policies and that if he had any questions he should ask Wade Rountree, the city's Human Resources Director. The plaintiff knew where Mr. Rountree's office was located and had talked to him many times.

The handbook provides that an aggrieved employee appeal the City Administrator's decision regarding an adverse action if it is filed within five working days of the employee learning of the decision. §§ 96.54.01–.03. The stated purpose of the appeal procedure is to "insure that due process is available to employees with a property interest in their jobs and to qualified handicapped employees. It is also intended to prevent violation of these policies in unlawful discrimination." § 96.54.

The appeal consists of a hearing that "will be less formal than a court hearing, but orderly." § 96.54.05. The employee may be represented by counsel. *Id.* The hearing panel "compile[s] evidence, make[s] determinations based on facts, and issue[s] a decision to the City Administrator." § 96.54.06. That decision "shall affirm, deny, or modify the decision on appeal" and is the final decision of the city. § 96.54.07.

The hearing panel is composed of three city employees: one appointed by the City Administrator; another appointed by the

appellant; and a third jointly selected by the two appointed members. § 96.54.04. The City Administrator and the appellant are directed to "cause their respective appointments to the panel to be made within three (3) working days of filing the appeal." *Id.* The two appointees select the third member within five working days of the filing of the appeal, and the hearing takes place within ten working days of the selection of the panel. § 96.54.03–04.

On October 16, the plaintiff hand-delivered a letter indicating that he wished to appeal City Administrator Carter's final decision. The plaintiff responded to each of the reasons given for his discharge and met with City Administrator Carter to discuss the points raised in his letter. The following day, City Administrator Carter wrote the plaintiff a letter acknowledging receipt of his appeal and reminding him of his obligation to select his member of the hearing panel within three working days of filing his appeal. She also advised him to notify her of his selection as soon as it was made.

The parties dispute whether City Administrator Carter appointed her member of the panel within the requisite time. However, they agree that the plaintiff never selected a panel member. He attempted to contact City Administrator Carter on two separate occasions during the three-day period, requesting information on how to select a panel member. City Administrator Carter did not respond, although the parties dispute whether she received his messages and was aware that he was having difficulty with the selection process. The plaintiff states that he understood City Administrator Carter's lack of response to mean that she was refusing to answer his question.

The plaintiff did not contact Mr. Rountree to seek assistance. If contacted, Mr. Rountree could have provided a list of city employees, as his office had provided similar lists in the past.

On October 25, seven days after the appeal was filed, City Administrator Carter sent the plaintiff a letter informing him that his appeal was "null and void" due to his failure to select a panel member, that her decision to discharge him was final, and that his effective date of discharge was October 16. The letter also stated that if he had any questions he could contact her in writing.

Upon receipt of the letter, the plaintiff did not attempt to contact City Administrator Carter or other city administrators regarding the letter or dismissal of his appeal. He indicates that he felt any further effort at that time would be "beating a dead horse."

## II. Legal analysis

### A. The plaintiff's motion to strike declarations

The plaintiff filed a motion to strike certain declarations and portions of declarations filed by the defendants in connection with their motion for summary judgment. The relevant declarations, and the plaintiff's stated reasons for striking them, are: (1) the declarations of J. Wade Rountree and Lt. Frank West, as they were not identified as potential witnesses within the applicable discovery period; (2) portions of the declarations of Kenneth Collins, Sonya Carter, and Chris McElroy to the extent that they contain hearsay; (3) portions of the declarations of Chris McElroy and Darrell Byrd to the extent that they contain hearsay and/or are subject to a best evidence objection; and (4) portions of the declarations of Sonya Carter, Chris McElroy, and Bobby Fronebarger to the extent that they contain conclusory allegations and/or impermissible legal conclusions without any basis.

Because the court did not consider any of the declarations at issue in ruling on the summary judgment motion, the plaintiff's motion to strike is DENIED as moot.

## B. The defendants' motion for summary judgment

### 1. The summary judgment standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes a court to enter summary judgment when all "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute exists as to any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This burden is discharged by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In determining whether the moving party has met its burden, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir.1996). Once the moving party has adequately supported its motion, the nonmovant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The applicable substantive law will identify those facts that are material. *Id.* at 248, 106 S.Ct. at 2510. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. *Id.*

Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In order for factual issues to be "genuine" they must have a real basis in the record. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. When the record as a whole could not lead a rational trier of fact to find for the nonmovant, there is no "genuine issue for trial." *Id.* (citations omitted).

In this instance, the plaintiff has asserted claims for (1) violation of his rights to procedural due process under the Fourteenth Amendment of the U.S. Constitution, (2) violation of his substantive due process rights under the Georgia Constitution, and (3) breach of his employment contract.

### 2. Violation of procedural due process rights under the U.S. Constitution

#### a. The legal standard

■ An individual's rights to procedural due process are rooted in the Fourteenth Amendment to the U.S. Constitution, which protects against deprivations of life, liberty, or property without due process of law. Thus, in the context of public employment, if an individual has a property right in continued employment, the state cannot deprive him of that property without due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). However, due process "is not a guarantee

against incorrect or ill advised personnel decisions." *Lee v. Hutson,* 810 F.2d 1030, 1032 (11th Cir.1987).

■ In order to establish a violation of procedural due process, a plaintiff must show (1) that he was deprived of a property interest by state action and (2) that he did not receive sufficient process regarding that deprivation. *Ross v. Clayton County, Ga.,* 173 F.3d 1305, 1307 (11th Cir.1999). In this instance, the parties do not dispute that the plaintiff had a property interest in employment. Thus, the issue is whether the defendants provided sufficient process in depriving the plaintiff of that property.

■ In determining whether the process provided to a plaintiff was constitutionally adequate, courts examine the procedural safeguards built into the statutory or administrative procedure effecting the deprivation and any remedies for erroneous deprivations provided by statute or tort law. *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990). Thus, in this instance, the court will consider both the process afforded to the plaintiff through the handbook procedures and the post-deprivation remedies available to the plaintiff under state law.[1]

■ Where the property interest is one of continued employment, the employee is entitled to "some kind of a hearing" prior to termination. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493 (citation omitted). This includes oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Id.* at 546, 105 S.Ct. at 1495. The hearing should serve as "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Id.* at 545–46, 105 S.Ct. at 1495. Thus, it need not be a full evidentiary hearing, nor does it need to definitively resolve the propriety of the discharge. *Id.*

■ If pre-termination proceedings are cursory, a full evidentiary hearing within a reasonable time after termination will ensure that an employee's rights to procedural due process are protected. *Id.* at 546–47, 105 S.Ct. at 1495–96. *See also Harrison v. Wille,* 132 F.3d 679, 684 (11th Cir.1998) (finding that employer's provision of a full post-termination proceeding added support to a conclusion that the employee was afforded sufficient process); *Hunt v. City of Mulberry,* 173 F.Supp.2d 1288, 1292–93 (M.D.Fla.2001) (holding that the plaintiff was afforded sufficient process when he was notified of the charges and evidence against him, given an opportunity to respond, and offered a post-termination hearing in which he presented evidence to a three-member panel). As long as the procedures available to an employee would fully protect his rights, they are deemed adequate even if the employee fails to use them. *Faucher v. Rodziewicz,* 891 F.2d 864, 870 (11th Cir.1990).

■ Regardless of the pre- and post-termination procedures offered to an employee, a deprivation of procedural due process "is not complete unless and until the State refuses to provide due process."

---

1. The plaintiff's procedural due process rights are determined by federal law. *Wofford v. Glynn Brunswick Memorial Hosp.,* 864 F.2d 117, 118 (11th Cir.1989). Thus, even if the defendants failed to comply with all of the handbook provisions, that failure is in itself insufficient to establish a violation of procedural due process. *See, e.g., Harris v. Birmingham Bd. of Educ.,* 817 F.2d 1525, 1528 (11th Cir.1987) ("the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal [C]onstitution").

*Zinermon,* 494 U.S. at 126, 110 S.Ct. at 983. In other words, a plaintiff does not suffer a violation of his procedural due process rights unless and until the state refuses to make available a means to remedy the deprivation. *McKinney v. Pate,* 20 F.3d 1550, 1563 (11th Cir.1994). If a state remedy "could have fully compensated the employee for the property loss he suffered," it satisfies procedural due process, even if the employee did not avail himself of it. *Id.* at 1564–65 (citation omitted). This includes the remedial process state courts would provide if asked. *Horton v. Board of County Com'rs of Flagler County,* 202 F.3d 1297, 1300 (11th Cir. 2000).

**b. Application in the instant case**

■ The court finds that the plaintiff's claim is barred because he had access to a remedy in state court, and he has not shown that this state law remedy would have been insufficient to satisfy due process. *See McKinney,* 20 F.3d at 1563–64 (holding that procedural due process claim, in which the plaintiff alleged that decision-makers in his pre-termination hearing were biased, was barred because the plaintiff did not show that post-termination remedies in Florida courts, which could have ordered a new hearing conducted by a fair tribunal, were insufficient).

■ Georgia law provides that a party may seek a writ of mandamus when no other specific legal remedy is available and a party has a clear legal right to have a certain act performed. O.C.G.A. § 9–6–20; *Cotton v. Jackson,* 216 F.3d 1328, 1331 (11th Cir.2000). This procedure can be used to compel a governmental body to act in compliance with the law, for instance to require a governmental board to hold a hearing as provided by law. *Acree v. Walls,* 240 Ga. 778, 784, 243 S.E.2d 489, 493 (1978).[2]

In this case, if the defendants had deprived the plaintiff of procedural due process in the course of his termination proceedings, the plaintiff could have sought a writ of mandamus to attain a new hearing in order to remedy that loss. The plaintiff admits that he did not seek any remedy in state court. Therefore, his procedural due process claim is barred. *See, e.g., McKinney,* 20 F.3d at 1563–64; *Cotton,* 216 F.3d at 1333 (holding that the district court erred in denying defendant's motion for summary judgment on a procedural due process claim, despite the fact that the employer did not provide a hearing before or after the plaintiff's discharge, because the writ of mandamus was available to the plaintiff and would have provided an adequate remedy, i.e., a hearing, to ensure that he was not deprived of his due process rights); *Lee,* 810 F.2d at 1032–33 (holding that dismissal of due process claims was appropriate, despite the plaintiff's claim that the procedures used in her termination were a sham, where an adequate remedy was available through state certiorari procedures).

■ Even if the plaintiff's claim was not barred because of the availability of an adequate state remedy, there is no genuine issue of material fact as to whether the procedures prior to and following his termination deprived him of procedural due

2. The plaintiff contends that this rule no longer applies, following the Georgia Supreme Court's decision in *Lewis v. City of Atlanta,* 274 Ga. 296, 296–97, 553 S.E.2d 611, 612 (2001). In that case, the court held that former city employees who filed a state action for wrongful termination while their § 1983 actions were pending were not entitled to injunctive relief, as "the pendency of the federal lawsuits and the availability of reinstatement or monetary damages by the federal court [are] evidence that other remedies exist." *Id.* at 297, 553 S.E.2d at 612. However, *Lewis* did not concern mandamus or the failure to provide a legally-required hearing and, therefore, it is inapposite.

process. First, prior to his termination, he was afforded "some kind of a hearing," including notice of the charges against him and an opportunity to present his side of the story. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. The undisputed evidence reveals that prior to the final decision regarding the plaintiff's termination, he (1) was given notice at each stage in the process that the city was considering discharging him for urinating in Mr. McElroy's boots, (2) was told at least twice, by Director Fronebarger and City Administrator Carter, the reasons why they were proposing that he be discharged for that act, (3) met with Chief Collins, Director Fronebarger, and City Administrator Carter and explained to them what he had done and why, and (4) wrote a letter, which was considered by City Administrator Carter, in response to the charges against him. The court finds as a matter of law that these procedures were sufficient to afford the plaintiff the requisite notice and opportunity to be heard prior to termination.

■ Nonetheless, the plaintiff argues that the proceedings leading up to his termination were a sham and, therefore, that he was not given a meaningful opportunity to respond to the charges against him. Where procedures are entirely a sham, they do not satisfy procedural due process. *See, e.g., Levenstein v. Salafsky,* 164 F.3d 345, 351 (7th Cir.1998) (concluding that the plaintiff was not given a constitutionally sufficient opportunity to respond because "the procedures used to investigate the charges [against him were] a sham through and through"); *Carter v. Harris,* 64 F.Supp.2d 1182, 1189 (M.D.Ala.1999) ("a plaintiff who can present evidence that the hearing was a sham is entitled to go forward with a procedural due process claim"). In this instance, the plaintiff contends that had he been given a meaningful opportunity to be heard, the evidence would have shown that he and Mr. McEl-

roy had an ongoing feud at the time of the incident, that only two of the thirty firefighters at the Fire Bureau thought he should be terminated, that his prank was within the atmosphere of other pranks committed there, and that morale was already a big problem.

However, the plaintiff's bare allegations do not create a triable issue as to whether the entire process was a sham. He does not contend that his post-termination hearing would also have been a sham, and all that was required prior to termination was a notice of the charges against him and an opportunity to be heard. The court concludes that the plaintiff has not created a genuine issue of material fact as to whether the pre-termination meetings with Chief Collins, Director Fronebarger, and Ms. Collins were a sham, so as to deprive him of procedural due process. *See, e.g., Schacht v. Wisc. Dep't of Corr.,* 175 F.3d 497, 504 (7th Cir.1999) (finding summary judgment on procedural due process claim appropriate where the plaintiff did not offer any independent evidence to support his allegations that his employer followed sham procedures and had improper motives and beliefs while investigating him), *overruled on other grounds, Higgins v. Miss.,* 217 F.3d 951 (7th Cir.2000). *Compare Adams v. Sewell,* 946 F.2d 757, 765–66 (11th Cir.1991) (concluding that a reasonable jury could find procedures inadequate, based on allegations that the process was a sham, where the plaintiff was given no notice of or opportunity to prepare for his pre-termination hearing, was asked to respond to vague allegations, was denied access to certain records, and was given a post-termination "hearing" in which the chairperson was the person who had conducted the pre-termination investigation, the review board refused to compel the employer's witnesses to appear for cross-examination, the plaintiff could not present some of his witnesses because the

one-day proceeding was not turned over to him until after his witnesses had left work for the day, the board denied the plaintiff's request for a continuance, and the board denied the plaintiff's grievance the same evening), *overruled on other grounds,* *McKinney,* 20 F.3d at 1550; *Carter,* 64 F.Supp.2d at 1189 (concluding that there was sufficient evidence to establish a violation of procedural due process, based on the plaintiff's allegation that her hearing was a sham, where the president rejected the results of a full evidentiary hearing, which found the evidence insufficient to prove the offense charged and recommended against firing, and ordered a new hearing).

Following his discharge, the plaintiff was provided access to an impartial hearing at which he could present evidence and obtain counsel to represent him. A hearing panel of three city employees would conduct the hearing, compile evidence, make factual determinations, and issue a final decision for the city. The employee handbook explains how to file an appeal and provides the schedule for filing the appeal, selecting panel members, and holding the hearing. Included in that schedule is the requirement that an appellant select a member within three working days. The handbook also instructs employees to consult the city's human resources manager if they have questions about the procedures.

The court finds as a matter of law that a three-day deadline in which to select a member of an impartial hearing panel is sufficient. *See, e.g., Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496 (noting that due process requires provision of a hearing at a reasonable time). The plaintiff admits that he was aware of this deadline and that he did not appoint a panel member or make any efforts to contact the human resources manager within three working days of filing his appeal.[3] Nor did he make any efforts to inform administrators that he still wanted to pursue his appeal after City Administrator Carter informed him that she was dismissing his appeal for failure to select a panel member. Therefore, the court concludes that the plaintiff was afforded sufficient process, but simply failed to avail himself of it.[4] *See Faucher,* 891 F.2d at 870 (holding that if the procedures available would fully protect an employee's rights to procedural due process, they are adequate even if the employee failed to use them); *Lewis v. Hillsborough Transit Auth.,* 726 F.2d 664, 667 (11th Cir.1983) (holding that the plaintiff could not make out a procedural due process claim where the alleged deprivation resulted from his own inaction in failing to utilize the available remedies).

Therefore, the defendants' motion for summary judgment is GRANTED as to the federal procedural due process claim.

---

**3.** The plaintiff argues that he left two messages for City Administrator Carter during the three-day period. However, the procedure set forth in the handbook provides that employees should contact the human resources manager with questions about the procedure. The plaintiff was aware of this provision and knew the human resources director. Therefore, it is irrelevant that he left any messages with City Administrator Carter.

**4.** The plaintiff does not argue that a post-termination hearing, as provided in the handbook, would not have afforded him adequate process. Nor can he, since he did not avail

himself of that process. *See Alvin v. Suzuki,* 227 F.3d 107, 118 (3d Cir.2000) (holding that the plaintiff could not challenge the adequacy of procedures when he failed to follow the prescribed processes). At any rate, the court finds as a matter of law that the procedures outlined in the handbook are sufficient to satisfy the plaintiff's right to due process. *See generally Harrison,* 132 F.3d at 684 (outlining procedures found to be constitutionally adequate); *Hunt,* 173 F.Supp.2d at 1292–93 (same); *Shaw v. Oconee County, Ga.,* 863 F.Supp. 1578, 1581–82 (M.D.Ga.1994) (same).

### 3. The plaintiff's remaining claims

The plaintiff has also asserted claims for violation of his substantive due process rights under the Georgia Constitution and for breach of his employment contract under Georgia law.

The court has jurisdiction over the federal claim in this case based on federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims based on 28 U.S.C. § 1367. The court, having granted summary judgment to the defendants on the federal claim, declines to exercise supplemental jurisdiction over the state law claims. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349–50, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) (holding that exercise of supplemental jurisdiction is at the discretion of the district court); 28 U.S.C. § 1367(c).

Therefore, the remaining state law claims are dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, the court hereby: (1) GRANTS the defendants' motion for summary judgment [Doc. No. 29–1] as to the federal claim; (2) GRANTS nunc pro tunc the plaintiff's motion to extent time to respond to the summary judgment motion [Doc. No. 32–1]; (3) DENIES as moot the plaintiff's motion to strike declarations [Doc. No. 44–1]; and (4) GRANTS nunc pro tunc the plaintiff's motion to file excess pages [Doc. No. 46–1].

The court declines to exercise supplemental jurisdiction over the remaining state law claims. Those claims are dismissed without prejudice.